KUEBLER FOUNDRIES, INCORPORATED, APPELLANT, v. H. J. KOEHLER MOTORS CORPORATION, RESPONDENT.

Submitted March 24, 1924—Decided May 19, 1924.

1. In the transaction of its usual course of business, such as is customarily conducted by corporation officers or other agents, a corporation is bound by an agent's undertakings in its behalf within the scope of his employment or apparent authority, just the same as would be an individual principal under like circumstances.
2. Such an agent, acting with reference to a corporation's usual course of business falling within his control by reason of the scope of his appointment or employment, may bind the corporation by ratification of a lawful contract made in its behalf by an unauthorized employe.

On appeal from the Supreme Court.

For the appellant, *Sidney W. Eldridge.*

For the respondent, *E. Eugene Turton.*

The opinion of the court was delivered by

WHITE, J.   This appeal is from a judgment upon directed verdicts in favor of the defendants both upon the plaintiff's claim and also upon the defendant's counter-claim.   The suit was to recover payment for certain automobile radiator castings, manufactured and furnished by the plaintiff to the defendant, a manufacturer of automobiles, in pursuance of a written order signed by the purchasing agent of the defend-

ant and accepted on a filled-in printed form by the plaintiff. Defendant's counter-claim was for an alleged overpayment by mistake of $879.09, more than the amount due under the contract. The order and acceptance fixed a price of "cost plus" for the first fifty sets of castings and seven cents and seven and five-eighths cents per pound (depending on the specified parts) for the castings after the first fifty sets, but there was also embodied a provision that the defendants were to furnish satisfactory patterns equipment from which to produce the castings at the minimum cost.

From the evidence in the case the jury would have been well justified in finding that the patterns supplied by the defendants were not proper patterns, but were of light wooden construction instead of being made of aluminum, which was the proper substance for their construction; that the plaintiff was put to great additional expense and delay by reason of these improper patterns, and, finally, when the defendant sent its representative and employe, Mr. Raymond, to plaintiff's foundries to hasten the manufacture and delivery of the castings, and to take away with him such of them as could be then delivered, that plaintiff advised this representative that it would be impossible to go ahead in the filling of the contract at the stipulated prices with the patterns which had been furnished, and that plaintiff would, therefore, if it went ahead with those patterns, have to charge twenty-two cents per pound instead of the seven and seven and five-eighths cents originally specified for the work with proper patterns; that Mr. Raymond, in consideration of plaintiff's waiver of its right to refuse to go on, agreed, on behalf of the defendant company, to the higher price thus demanded; that the plaintiff went ahead with the work under this new contract during a period of some six or eight months, furnishing the castings from time to time during all of that time, and billing the defendant for them, expressly at the new price of twenty-two cents per pound, as each shipment was delivered; that many of these bills were paid in full, and that payments upon others were made "on account"; that frequent dunning letters were written by the

plaintiff to the defendant during a period of a year and a half urging payment, and frequent replies (many of them after defendant admittedly knew of the Raymond agreement) were made by the defendant to the plaintiff promising larger payments on account and begging for additional time, and that in none of these communications, nor otherwise, was any objection ever raised to the twenty-two-cent per pound charge during all the time while the work was going on and the bills being rendered, and for a long time thereafter; that some of the letters from the defendant company begging additional time for payment of these bills, and making no objection to the twenty-two-cent charge, were signed by the president of the defendant company; that the treasurer of the company, whose duty it was to pass upon the propriety of bills rendered to the company and to pay them, knowingly paid in full some of these bill thus rendered, expressly on the twenty-two-cent basis, without making any objection thereto, and then, as she testified, conceiving that at some future time it might be desirable to raise a question as to the price charged, made the other payments which were made "on account," but without objecting in any way to the charge of twenty-two cents that was being made; that the first objection to the twenty-two-cent charge was not made until long after the plaintiff company finally refused to go further with the work without being paid, and not until suit was threatened.

The learned trial judge, taking the view that defendant's representative, Raymond, who made the agreement as to the higher price, was not shown to have had authority from the corporation to change the written contract already existing in the premises, and that there was no evidence to go to the jury of ratification by the corporation itself of the contract thus made, directed the verdicts for the defendant now complained of. We think this was error.

As to the question of authority from the corporation to its agent, it is, of course, well settled that where the attempt is to alter the provisions of a formal agreement of the corporation under its corporate seal, and covering a subject-matter

not embraced within the ordinary course of its business, the transaction of which customarily devolves upon its proper officers and agents, the same authority, viz., enabling action by the directors of the corporation, as was required for the original making of the contract, is essential. *Mausert* v. *Feigenspan*, 68 *N. J. Eq.* 671. But the principle here applicable, we think, is the one also expressed in the opinion of the Chief Justice, speaking for this court in that case, where, with reference to the powers of the president of a corporation by virtue of his appointment as such (and the same rule applies to the powers of any other duly appointed agent of a corporation within the scope of his appointment), he said: "He may, without any special authority from the board of directors, perform all acts of any ordinary nature which by usage or necessity are incident to his office, and may bind the corporation by contracts in matters arising in the usual course of business."

This, manifestly, must be so. In modern times a great majority of all business enterprise has assumed corporate form. Not only is it the apt vehicle for promoting and managing large enterprises where the combined capital contributions of the many are essential for success, but the corporation is also the most scientific and satisfactory form of partnership between two or more people, who, desiring to create and conduct a comparatively small business enterprise together, desire also to eliminate the element of the danger of its sudden termination, and, in all probability, unjust reorganization, in the event of the death of what would otherwise be one of the partners. It is obviously essential, therefore, in the great mass of a corporation's usual course of business necessarily and customarily conducted by its officers and other agents, that the same principles which apply to and fix the rights and obligations arising from the doctrine of agency in the individual business world, should also apply as well where the principal is a corporation as where it is an individual. In either case, "in matters arising in the usual course of" its or his business, the principal, whether a corporation or an individual, is bound by the agent's under-

takings in its or his behalf within the scope of such agent's employment or apparent authority. The third party who deals with such agent should not, and does not, have to look further than that.

In the present case the principal was a corporation whose business was the manufacture and sale of automobiles. As such, a part of "its usual course of business" obviously was the procuring of necessary materials for use in such manufacture. Its purchasing agent contracted for certain of such materials, namely, castings for the radiators, with the plaintiff company at certain prices and upon certain terms. Subsequently, it became necessary, in order to avoid a perfectly lawful cancellation because of defendant's default in furnishing proper patterns, to alter this contract so as to provide for the payment of a higher price for the castings. That such a necessary or desirable change in the contract was as much within the scope of the purchasing agent's apparent authority as was the making of the original contract, is, we think, quite obvious. His apparent authority as purchasing agent clearly included both, and, of course, he could exercise it quite as well by a messenger or representatives sent and directed accordingly as he could by his own personal direct action.

This being so, we come to the question of the authority of Raymond, an employe of the defendant company, who went as the representative of his employer to the plaintiff's factory, saw the latter's general manager, and, as the jury might have found from the evidence, made the contract in question. Raymond himself testified that he was employed in defendant's sales department, but, obviously, he did not visit the plaintiff's factory to make a sale. He says he went to hurry up the manufacture and delivery of the castings and to bring back with him such as were ready for delivery. He does not say who sent him on this errand, and he does not remember whether he made the alleged contract or not, but does remember being shown the defective patterns. The purchasing agent himself was not called to testify, nor was the president of the defendant corporation. If either of them did

in fact send Raymond with instructions to do as he did, the contract was binding upon the defendant. In view of these facts, and of the further facts that the contract, as the jury might well have found, was acted upon by both parties for six or more months thereafter, under circumstances which indicated full knowledge of it on both sides, it is not at all certain that no jury question was here involved.

This point, however, we do not find it necessary to decide, because, assuming that Raymond made the contract (if he did make it, which is, of course, a jury question) without instructions so to do from an authorized agent of the company and without other authority, nevertheless the contract, being one which the defendant company could lawfully have made, might have been ratified by the company or by its agents acting within the scope of their authority, so as to have become binding upon the company. *Metropolitan Telephone Co.* v. *Domestic Telegraph Co.*, 44 *N. J. Eq.* 568. We are clearly of opinion that there was ample evidence of such ratification to raise a jury question on this point, and that the direction of a verdict was therefore erroneous, both upon the plaintiff's claim and also upon defendant's counter-claim. Regarding the latter, we also think it was a jury question whether or not the alleged overpayments set up therein had not been made voluntarily with full knowledge of the facts involved.

The judgments upon the verdict on plaintiff's claim, and also upon the verdict on defendant's counter-claim, is reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, McGLENNON, KAYS, JJ.    16.